IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

REGIS GRICE,

                          Plaintiff,                    OPINION and ORDER

          v.                                            18-cv-923-slc

TAPIO, *et al.*,

                          Defendants.

Pro se plaintiff Regis Grice, a prisoner at Waupun Correctional Institution, brought this lawsuit to challenge the manner in which current and former Wisconsin Department of Corrections (DOC) employees handled his need for medical treatment and pain relief related to his degenerative joint disease in his left hip.  I granted Grice leave to proceed on   Eighth Amendment deliberate indifference and Wisconsin negligence claims against Nathan Tapio, Chrystal Meli, and Dr. Jeanpierre related to delays and mishandling of Grice's degenerative hip condition, and against Dr. Jeanpierre, Meli, Dr. Kristina Deblanc, Ryan Kuepper, Captain Kyle Tritt, Nurse Donna Larson, and Bailey Frame for their alleged refusal to approve Grice for a special mattress.

Every single party has filed a motion for summary judgment.  (Dkts. 54, 80, 86, 91.)  On the record before the court, I am denying Grice's motions, granting Dr. Jeanpierre's motion, and granting in part and denying in part the state defendants' motion.

As discussed below, no reasonable jury could find that defendants Tapio, Dr. Jeanpierre, or Meli responded to Grice's requests for pain relief and treatment with deliberate indifference. No reasonable jury could find that Dr. Deblanc was personally involved in reviewing any of Grice's mattress requests, or that Meli Kuepper, Frame, Tritt, or Larson acted with deliberate indifference in denying Grice's November 29, 2018, and January 8, 2019, mattress requests.

The record may support a finding of deliberate indifference with respect to defendants Meli, Kuepper, Frame, Tritt, and Larson's January 17, 2019, denial of Grice's request for a medical mattress.  Accordingly, that claim will proceed to trial.

As for Grice's state law claims, Grice failed to follow Wisconsin's notice of claim procedures to pursue his negligence claims against the state defendants, so I must dismiss those claims against the state defendants.  I am relinquishing jurisdiction over Grice's state law claim against Dr. Jeanpierre.


UNDISPUTED FACTS[1]

A.    Parties

At all times relevant to his claims in this lawsuit, plaintiff Regis Grice was incarcerated at Waupun, where  the state defendants were working.  The state defendants include Nurse Practitioner (NP) Nathan Tapio; Dr. DeBlanc, a Psychological Associate; Nursing Supervisor/Health Services Manager (HSM) Chrystal Meli (formerly Chrystal Marchant); and Ryan Kuepper, Captain Kyle Tritt, Nurse Donna Larson, and Bailey Frame, members of the Special Needs Committee ("the Committee").

The only defendant no longer employed by the DOC is Dr. Cheryl Jeanpierre, an internal medicine and emergency room physician.  Dr. Jeanpierre started working at Waupun as a physician in May 2018.  In June of 2019, Dr. Jeanpierre split her time between Waupun and Dodge Correctional Institution (Dodge), but she stopped working at Waupun altogether after

---

[1]  Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support.

June 2019.

Grice is proceeding on these deliberate indifference and negligence claims: Tapio's handling of his medication and need for a supportive pillow in June and September of 2018; the Committee's failure to grant Grice permission to use a medical mattress on November 29, 2018, January 8, 2019, and January 17, 2019; Meli's failure to follow up about Grice's requests and complaints in responding to his requests; and Dr. Jeanpierre's management of Grice's pain and need for treatment related to his left hip.

### B.   Health Service Unit Treatment Procedures

When an inmate has a medical concern that he wishes to communicate with medical staff, he may fill out a Health Services Request form (HSR) and submit it to the HSU.  HSRs are collected once per night and triaged by nursing staff the following morning.  Nursing staff schedule appointments for inmates based on the symptoms they report in their HSR.  Inmates reporting urgent symptoms are scheduled for a same-day appointment with a nurse.  If the nurse conducting the assessment concludes that the symptoms require immediate assessment by an advanced care provider (ACP), then the provider is called to examine the patient.  If the nurse concludes that immediate assessment by an advanced care provider is not necessary, then the nurse schedules the patient to see the advanced care provider in the future.

As HSM, Meli provides overall administrative support and direction to the Health Services Unit (HSU).  Furthermore, in her role as HSM, Meli does not typically see the HSRs submitted to the HSU unless nursing staff forward them to her to address a particular issue.  Meli avers that in her capacity as HSM, Meli does not have authority to (1) prescribe medication, (2) refer patients to offsite specialists, or (3) override treatment decisions of the

HSU's advanced care providers (physicians, nurse practitioners, and physician assistants).  Grice disputes this, pointing to an instance in 2019 in which Meli cancelled an "order" from Dr. Jeanpierre to place Grice in a single cell.  (*See* Grice Aff., Ex. B, dkt. 104-2.)  However, as will be explained below, single cell assignments are determined by committee.  Grice also claims that Meli agreed to look into moving an appointment for him, citing a January 25, 2019, communication in which Meli wrote that she would "look into" moving an appointment for him. (*See* dkt. 85-43.) The evidence Grice cites creates a factual question about whether Meli could attempt to move on-site appointments and cancel a single cell order.  However, it remains undisputed that Meli cannot override prescription decisions or make offsite referrals.

Dr. Jeanpierre explains that in her role at Waupun, she typically saw inmates through scheduled appointments, which were generally scheduled by HSU staff.  Because she was one of the only advanced care providers at Waupun, Dr. Jeanpierre sometimes had to cancel one inmate's appointment because of another inmate's urgent or emergent need for medical treatment.  While working at Waupun, Dr. Jeanpierre had to seek approval to prescribe certain non-formulary medications, as well as off-site care and treatment, including surgeries.  If approved, then off-site care would be arranged by HSU staff, a process that may take months.

### C.    Grice's Treatment for his Left Hip at Waupun

On March 15, 2018, before his arrival at Waupun, Grice underwent an intake assessment at Dodge Correctional Institution.  Grice reported "left hip pain for many years that is progressively getting worse." (Meli Decl., Ex. 1000, dkt. 94-3, at 18-19.) The provider observed that Grice could ambulate without difficulty and did not appear in acute distress, but

nonetheless ordered an x-ray of Grice's left hip.  At a March 22, 2018, follow-up appointment, Grice further reported that he had been hit by a car as a child, but he did not recall whether he was hit on the right or left side.  According to Tapio, the radiologist's report from Grice's x-ray concluded that Grice had severe degenerative changes of the left hip.  However, on April 13, 2018, Grice underwent a follow-up x-ray, the conclusion of which was moderate arthritis of the left hip, with a note about a concern for an old fracture involving the femoral neck.  (Ex. 1000, dkt. 94-3, at 133.)

On April 23, 2018, Grice was transferred to Waupun.  To outline the facts material to Grice's claims, I begin with a timeline of his treatment between June of 2018 and June of 2019, which includes the treatment decisions by Tapio and Dr. Jeanpierre, as well as Meli's responses to Grice's requests for information.  I separately detail the Committee's decisions on his mattress requests that took place during the same time period, and Grice's related inmate complaint.

### 1.    NP Tapio's Treatment

Tapio met with Grice on June 20, 2018.  Tapio noted that Grice was a young man (28 years old at the time) with degenerative changes to the left hip, and that Grice did not suffer an injury or trauma related to his hip.  Grice reported that his medications – Tylenol and ibuprofen – were not helping his pain.  Therefore, Tapio ordered a trial of naproxen and a topical arthritis pain relief cream (capsaicin).  Tapio also provided information about antidepressants used for chronic pain for Grice to review and consider.  Tapio further ordered an MRI of Grice's left hip, a follow-up consult with Orthopedics, a referral to physical therapy, and screening laboratory studies to look for possible causes of inflammatory arthritis.

Grice does not dispute that Tapio agreed to order those interventions, but he claims that

they also discussed Grice receiving a supportive pillow.  It is undisputed that Tapio did not order Grice a "supportive pillow" during this visit, and Tapio's notes do not reflect such a discussion. (Ex. 1000, dkt. 94-3, 2-3.)  Tapio attests that there are no medical guidelines recommending the use of a pillow to treat a medical condition.  Rather, pillows are comfort items that may be ordered by nursing staff, the Committee, or a provider if a medical need exists.  As such, Tapio's position is that if Grice had asked for a pillow, then Tapio would have referred Grice to the Committee.  For his part, Grice claims that he asked Tapio for a pillow, and Tapio suggested that Grice put a pillow between his legs to provide comfort for his hip. Grice further claims that in September 2019, Tapio *did* order him a supportive pillow.  Although the record of Grice's medical restrictions does indicate that on September 17, 2018, Grice was given a medical restriction for an extra pillow, that record does not reveal who placed the order, and Grice does not cite any portion of his medical records identifying who placed the order.  (Ex. 1004, dkt. 94-2, 3.)

It is undisputed that after that appointment, Tapio placed the order for naproxen, an MRI, physical therapy, and an orthopedics consultation that same day, June 20, 2018.  (Tapio Decl, dkt. 95, ¶ 12.) Tapio further explains that medication orders are sent to nursing staff the day the patient is seen in the clinic, and nursing staff submit the orders to the Central Pharmacy, with a turnaround time of three days.  In the meantime, the patient may use over the counter medication.

Grice did not receive the naproxen within three days.  On July 1, 2018, when he still had not received the naproxen, Grice submitted an HSU slip complaining that he still had not received his new medication.  The records show that a nurse scanned Tapio's order for naproxen

to the Central Pharmacy on June 29, 2020, and that nursing staff provided Grice his first dose of naproxen on July 3, 2018.

Tapio attests that he has no knowledge that there was a delay dispensing naproxen to Grice. He further attests that the recommended course of treatment for chronic arthritic pain such as Grice's is over-the-counter or prescription nonsteroidal anti-inflammatories such as ibuprofen, naproxen, *etc.*, to reduce swelling and associated pain, and to treat with other conservative pharmacologic and non-pharmacaologic options such as low-impact exercise, physical therapy, injections, heat, and ice. If these measures fail, then stronger or alternative pain medications or further interventions may be considered.

On July 24, 2018, Grice submitted an information request to Meli, complaining about the amount of time it took for him to be seen in the HSU for his hip, despite submitting multiple HSRs in May of 2018. Meli responded on July 25, 2018, explaining that the review of those requests resulted in Grice being placed on a list to see a provider; if Grice's symptoms had worsened, then he could have been seen by a nurse in the meantime.

On August 23, 2018, Grice submitted an HSR complaining that he had not yet started physical therapy and he wanted to see a specialist, adding that he felt his condition was being ignored. Grice received a response that he could discuss his concerns at his appointment. That same day, Tapio examined Grice. Tapio noted that Grice presented with no acute distress, normal strength in his bilateral lower extremities, and normal vital signs. Grice claims that he also reported pain and problems walking and laying down. Tapio ordered a trial of amitriptyline for chronic pain management and to help him rest, and a lower tier restriction to limit stair climbing. (At that time, Grice already had a lower bunk restriction.)

On September 2, 2018, Grice submitted an HSR asking to start physical therapy and to see a specialist. He also complained that the ACP ordered him a pillow but he had not received it. HSU staff responded that the specialist and physical therapy appointments were being arranged, but that there was no order for a pillow. On September 4, 2018, Grice directed an HSR to Tapio, asking when he would see him again and asking about the pillow that Tapio said he would order. Grice also complained about pain and reported that he wanted to see a physical therapist, and wanted to be taken off Elavil (the brand of amitriptyline he was taking). A nurse responded that there were wait times for an MRI, for the ortho consult, and for physical therapy, and that Grice could refuse the Elavil.

On September 13, 2018, Grice submitted another HSR, complaining that he needed new pain medication, describing his pain as an emergency. He received a response that he was scheduled to meet with an advanced care provider. On September 24, 2018, Tapio examined Grice. Grice reported that he did not like the effects of amitriptyline. Tapio noted that Grice had only taken seven doses of that medication. (Ex. 1000, dkt. 94-3, at 22-23.) Grice rated his pain at a 9 out of 10, but Tapio noted that he exhibited no outward signs of discomfort. Grice adds that he reported to Tapio that he was having the side effect of "urinary trouble," and Tapio responded that he doubted that Grice would have that side effect at his current dosage. Regardless, Tapio started Grice on a trial of celecoxib (Celebrex), a prescription strength nonsteroidal anti-inflammatory drug used to treat arthritis and acute and chronic pain, and nortriptyline, to be taken in addition to an increased dose of acetaminophen. Tapio also prescribed Grice a different analgesic menthol balm for topical use. Tapio attests that he wanted to try celecoxib because when patients use a particular anti-inflammatory agent for a long period

of time, that agent may lose its effectiveness.  Since Grice had not yet tried this medication, and because this medication might also reduce the risk of an ulcer, Tapio discussed it with Grice, who agreed to try it.

Grice claims that around this time, a nurse ordered Lyrica for him, and Tapio cancelled the order.  There is no record indicating Grice was prescribed Lyrica by another provider around September 22, 2018, or that Tapio discontinued a Lyrica prescription.  Tapio attests that Grice's symptoms did not show a need to take Lyrica, which is used to treat neuropathic pain.

On September 27, 2018, Meli responded to an information request from Grice dated September 20, 2018.  In it, Grice complained that he had not yet began physical therapy or seen a specialist, and that his pain medication was not working.  Meli responded on September 27, 2018, addressing both his concerns about physical therapy and medications.  As to the former concern, Meli responded that Grice was on the waiting list to be seen by Waupun's physical therapist.  Meli attests that she has no control over the physical therapist's schedule; the physical therapist triages patient referrals and manages his own schedule, and the waiting list for physical therapy usually is between three and six months.  Meli states that, at the time she responded, she did not view it as unusual that Grice had not yet seen the physical therapist.  Grice claims that Meli could have moved up his physical therapy appointment.  As for his medications, Meli noted that Grice had been seen by an advanced care provider on September 24, 2018, who started him on new medications for his pain complaints.

Grice started physical therapy for his left hip on October 24, 2018.  The physical therapist, Bartz Richard, noted that Grice's x-ray taken from Dodge Correctional Institution suggested "severe" degenerative joint disease. (Pl. Ex. 59, dkt. 59-1, at 64.) Bartz recommended

that Grice use a cane and receive ice therapy, as well as various mobility exercises.  (Pl. Ex. 59, dkt. 59-1, at 63.)[2]

On October 28, 2018, Grice submitted an HSR complaining about pain and writing that he was still waiting to receive celecoxib, which had been ordered on September 24, 2018.  Grice received that medication on October 30.  Grice had a physical therapy appointment on November 7, 2018, but could not tolerate the activities due to the pain.

On October 30, 2018, Grice submitted another information request, complaining that he only started receiving his celecoxib that day, even though it had been ordered on September 24, 2018.  On November 6, 2018, Meli responded that the situation had been looked into, and adjustments were made for him to receive the medication in a timely manner.

### 2.    Dr. Jeanpierre's Treatment

On November 9, 2018, Grice met with Dr. Jeanpierre for the first time in person.  During that visit, Grice told Dr. Jeanpierre that his pain in his hip dated back to April 2010, but there had been no trauma to the hip.  Grice rated the pain in his hip a 10 out of 10.  Dr. Jeanpierre examined Grice, noting leg length discrepancy; that Grice had moderate degenerative joint disease in his left hip; and that he had a pending MRI and orthopedic consult.  Grice told Dr. Jeanpierre that the capsaicin and Celebrex were not working.  Therefore, Dr. Jeanpierre prescribed nortriptyline, 10 mg.  At that time, Dr. Jeanpierre did not realize that Grice was already prescribed nortriptyline.  Therefore, immediately after the visit, Dr. Jeanpierre prescribed

---

[2] Grice attended a total of six visits with Bartz, the last of which took place on December 5, 2018. The records indicate that Grice and Bartz agreed that physical therapy was not improving his condition. (Meli Decl., Ex. 1000, dkt. 94-3, at 84-87; Grice 8/17/20 Aff., Ex. E, dkt. 121-5, at 2.)

him duloxetine (Cymbalta) in addition to nortriptyline, capsaicin, Celebrex, and acetaminophen, and she adjusted her note accordingly.  That same day, Grice attempted to attend physical therapy, but it was too painful.

On November 12, 2018, Grice was x-rayed.  The image showed "degenerative changes." According to Tapio, Grice's previous two x-rays did not indicate Grice's degenerative joint disease had been advancing.  As such, in Tapio's view, because Grice did not report that he had other imaging done before his incarceration by the DOC, the medical providers at Waupun had to rely on the imaging studies Grice underwent within the DOC.

On November 14, 2018, Grice's physical therapist entered an order approving Grice for a wooden cane and a heel lift.  On November 21, 2018, Grice met with Dr. Jeanpierre about his inability to participate in physical therapy.  She responded that she would review his chart, noting that she believed Grice was scheduled for an MRI.

On November 21, 2018, Grice directed another information request to Meli, complaining that he was in excruciating pain from his left hip, and that his pain medications were not working.  Meli responded that Grice had just been started on a new pain medication on November 13, 2018, and that Grice could address his complaints about his pain during his upcoming appointment.  Indeed, non-defendant Nurse Jensen also noted on the same response that Grice had an MRI, an orthopedic consult, and follow-up appointment with the physician all scheduled to take place within the next two months.

On November 28, 2019, Grice wrote to Dr. Jeanpierre that he was still waiting for new medications, that he could not participate in physical therapy, and that his HSRs were being

ignored.  HSU staff responded that he had three appointments in the next six weeks, but would forward his concern to the doctor to see if she wanted to meet with him sooner.

On December 4, 2018, Grice wrote to Meli that he still had not been seen about new medications, and that he needed to see a doctor.  On December 6, 2018, Dr. Jeanpierre refilled Grice's prescription for capsaicin cream for six months.  On December 7, 2018, Meli wrote that she had reviewed Grice's record and moved forward his appointment to see the provider.  (Ex. 26, dkt. 59-1, at 28.)  Grice also wrote to the HSU on December 12, again complaining that he still had not been seen for new medications.

On December 13, 2018, Grice met with Dr. Jeanpierre.  Grice continued to rate his pain a 10 out of 10; the pain was worse when he walked or attempted to sit; and that the sensation was stabbing.  Grice reported that he had not participated in recreation or physical therapy due to the pain.  Dr. Jeanpierre again noted Grice's condition, and that he had pending MRI and orthopedic consults.  She examined Grice and noted his flexion in his left hip was minimal, at 10 degrees.  Dr. Jeanpierre decided to change his medication, prescribing him a trial of gabapentin 300 mg, twice daily, and a Medrol-Dosepak (a steroid treatment) for six days.  She also continued him on duloxetine.  Also that day, Dr. Jeanpierre issued an order for Grice to have a feed cell assignment for 180 days, due to his left hip pain.

Later that day, Grice wrote to Meli, complaining that he should not have had to wait so long to see her when he was taking medications that were not addressing his pain needs.  Meli responded on December 18, 2018, that Grice was scheduled to see the provider.

On December 26, 2018, Grice underwent an MRI of his left hip at Waupun Memorial Hospital.  The MRI report indicated "Moderate left hip osteoarthritis with degenerative

changes." Dr. Jeanpierre initialed a copy of the MRI report on December 27, 2018, and initialed a second copy of the report on January 2, 2019.

On January 2, 2019, Dr. Jeanpierre examined Grice. Dr. Jeanpierre noted that Grice could ambulate with a cane but had pain in his left leg. Grice reported that the gabapentin was not helping his pain. Therefore, Dr. Jeanpierre doubled his daily dose of gabapentin and referred him to a pain clinic for possible injections. She further noted that she would meet with him again regarding the MRI results.

On January 8, 2019, Grice underwent x-rays at Agnesian Healthcare Clinic in Waupun, Wisconsin. Dr. Eric Nelson reviewed his x-rays as well as Grice's December 26, 2018, MRI. Dr. Nelson concluded that his left hip showed "severe degenerative arthritis," and that he believed Grice's condition was the result of an injury that he sustained as a child. (Ex. 35, dkt. 59-1, at 38.) Dr. Nelson was struck by the severity of Grice's condition, given his age, describing Grice as presenting a "difficult case without any type of straightforward solution." (*Id.*) Additionally, with respect to the MRI, Dr. Eric Nelson commented: "The radiologic report from the MRI document what they describe as only moderate degenerative changes but having seen the plain films I think that the adjective moderate is an inaccurate understatement of the extent of his disease." (*Id.* at 42.) Dr. Nelson recommended floroscopic injections into Grice's left hip of 40 mg of Kenalog and 3 mL of 1% lidocaine, to help with his symptoms. (*Id.*) Finally, Dr. Nelson wrote that if the injections did not help, then Grice should have a consultation with a tertiary hip specialist at the University of Wisconsin.

Later that day, Dr. Jeanpierre reviewed the MRI results. Dr. Jeanpierre decided to wait for the results from the orthopedic surgeon consult to determine next steps. However, after

learning from a nurse that Grice asked for an increased dose of gabapentin, Dr. Jeanpierre increased Grice's gabapentin dose to 600 mg four times daily.

On January 21, 2019, Dr. Jeanpierre placed off-site service requests for Grice to have the recommended injections into his left hip. On January 22, 2019, Grice submitted an HSR complaining that he was in pain and that Dr. Nelson recommended an injection. An HSU nurse responded that the injection had been ordered, and that his gabapentin order had been doubled recently.

On January 31, 2019, Grice directed an information request to Dr. Jeanpierre, complaining that he had asked to be seen, but that he had not been called to be seen, and that on January 21 he had met with a nurse and discussed needing a medical mattress and a single cell. He also complained that Dr. Jeanpierre had cancelled an appointment. A nurse responded on February 2, 2019, that Dr. Jeanpierre had cancelled the appointment, that a medical mattress had been denied, and that there was no order for a single cell.

Grice submitted another information request on February 2, 2019, asking why Dr. Jeanpierre had cancelled the appointment. On February 4, 2019, a nurse responded that because an appointment for the injection was scheduled, there was no need to see a physician on site at that time.

On February 11, 2019, Grice submitted an HSR, again complaining about his pain and asking for new medications and a better mattress. On February 12, 2019, a nurse responded that Grice was scheduled for hip injections soon, his gabapentin had been increased, and that Grice should continue to take celecoxib as prescribed, noting that he had not been taking it. Also that day, Grice submitted an information request regarding his hip pain and medications,

requesting to see a doctor.  The next day, a nurse responded that Dr. Jeanpierre had not been at Waupun for over a week, that "Her return [was] uncertain," and that staff was "in the process of finding additional doctor to cover her patients."  (Schneider Decl., Ex. A, dkt. 89-2, 318-20; *see* Jeanpierre Decl., dkt. 88, ¶ 20.)

On February 19, 2019, Grice submitted an HSR asking why his appointment for that day with Dr. Jeanpierre had been cancelled.  On February 20, 2019, Meli responded that there was a change to her schedule.

On February 21, 2019, Grice underwent left hip injections of 40 mg of Kenalog and 3 mL of lidocaine at Waupun Memorial Hospital.  Dr. Jeanpierre initialed a copy of the procedures the next day.  Grice claims that the injection did not help with his pain.  On February 24, 2019, Grice submitted an HSR to the Committee asking for a medical mattress and to be placed in a single cell.  On February 27, 2019, his request was forwarded to the Committee.

On February 28, 2019, Grice, Dr. Jeanpierre, and a nurse signed a "Chronic Pain Management Agreement."  The agreement provided that due to Grice's degenerative joint disease, he suffered chronic pain, and he agreed to cooperate with Dr. Jeanpierre for his chronic pain management.

On March 4, 2019, Grice saw a nurse for a sick call visit.  The nurse noted Grice's ongoing hip pain, that his recent injection had not given him relief, and that he was experiencing stomach pain that he believed was associated with his medication.  The nurse noted that she would speak with a provider about Grice's medication and stomach issues, and that she would also scheduled an appointment with his provider.  The nurse emailed Dr. Jeanpierre about these issues, and Dr. Jeanpierre responded that Grice could take both medications.

15

On March 6, 2019, Dr. Jeanpierre examined Grice, noting his diagnosis and referral to UW-Madison to discuss surgery.  Dr. Jeanpierre noted that Grice walked with a limp, and Grice reported that gabapentin helped but wore off, and that he believed Celebrex upset his stomach. That day, Dr. Jeanpierre referred Grice to a tertiary orthopedic hip specialist and indicated she would follow-up after the evaluation.  Dr. Jeanpierre also approved an order for a medical mattress and increased Grice's gabapentin prescription to 900 mg four times per day (up from 600 mg four times per day).  On March 7, 2019, Grice was approved by the Committee for two mattresses.  On March 16, 2019, Grice underwent an x-ray, and the finding as to his left hip showed "severe degenerative change."  (Grice 11/30/19 Decl., dkt. 59-1, ¶ 4; Ex. 1, dkt. 59-1, at 1.)

On April 18, 2019, Grice had an off-site appointment with a University of Wisconsin orthopedic physician, Dr. David Hennessy.  The physician explained that Grice had the option of continuing with his condition as is, or he could pursue surgery.  On April 22, 2019, Dr. Jeanpierre saw Grice in person, and they discussed the potential for surgery.  Besides noting Grice's numerous prescriptions, Dr. Jeanpierre also ordered a longer cane, an outside consult for surgery, to continue with ice therapy, lidocaine cream, and to continue with a low bunk.

On May 17, 2019, Dr. Jeanpierre submitted an authorization request so that Grice could move forward with the total hip replacement.  On June 2, 2019, Dr. Paul Bekx, the Bureau of Health Medical Director, asked Dr. Jeanpierre to assure him that UW-Madison did not feel there were other options for Grice beyond hip replacement surgery.  Dr. Bekx wrote that he would approve the surgery once Dr. Jeanpierre confirmed there were no other treatment options. That same day, Dr. Bekx approved the left hip replacement surgery.

16

On June 2, 2019, Grice's scheduled appointment with Dr. Jeanpierre had to be reset for June 5, and his June 5 appointment also had to be rescheduled. Grice submitted information requests about both cancellations, and received responses that he was rescheduled and that the doctor must have had something come up. On June 10, 2019, Dr. Jeanpierre met with Grice to discuss his medications and surgery. After reviewing his medication chart, Dr. Jeanpierre concluded that gabapentin was not helping him. She provided Grice information about pregabalin (the generic term for Lyrica) and filled out a non-formulary drug request. Dr. Jeanpierre also put in a request for Grice to have a single cell. However, on June 10, 2019, Waupun's pharmacist John Tuten did not approve Dr. Jeanpierre's request to prescribe Grice's pregabalin, since Grice did not have a diagnosis of neuropathy and had a history of polysubstance abuse. Tuten recommended that Dr. Jeanpierre prescribe NSAID's, including naproxen or increasing his ibuprofen prescription. On June 19, 2019, Dr. Jeanpierre prescribed Grice naproxen 500 mg twice a day, a larger dose than Grice had received previously. Additionally, Dr. Jeanpierre responded to a June 16, 2019, information request from Grice, writing that the Committee did not approve his single cell request, and that the pharmacy did not approve pregabalin because he did not meet the criteria.

On June 25, 2019, Grice submitted an information request asking Dr. Jeanpierre about the pregabalin order. Dr. Jeanpierre responded on June 28, 2019, advising that the request had been rejected by the pharmacy, since Grice did not have neuropathic pain and had a history of polysubstance abuse.

After that, Dr. Jeanpierre had no further involvement in Grice's medical care and treatment, and APNP Mary Moore met with him about his left hip pain. On July 15, 2019,

17

Grice wrote to the HSU complaining that he had not yet received the medication that Dr. Jeanpierre prescribed, also requesting that his surgery be moved up.  HSU staff responded that he had an appointment with an advanced care provider scheduled, and he was awaiting surgery. On July 19, 2019, Moore discontinued Grice's Celebrex and ordered salsalate 750 mg twice daily.  On July 20, 2019, Grice wrote to Meli complaining that he heard his surgery had not yet been scheduled, and Meli responded that the surgery was in the process of being scheduled.  On July 24, 2019, Grice complained to Meli that he still had not received medication that Dr. Jeanpierre ordered on June 10, 2019, and that Moore had ordered the week prior.  Meli responded that after reviewing the file, the salsalate was sent out to him.

On December 4, 2019, Grice underwent total left hip replacement surgery.

### 3.     The Committee's Medical Mattress Decisions

Appendix 1 to Health Services Procedure and Policy 300.07 establishes the protocols and guidelines for DOC staff to use in evaluating special needs and medical restrictions for inmates. With respect to mattresses in particular, there are two types of mattresses that require approval. The first is referred to as a "thick mattress," approval of which may go through the Committee, for inmates who are pregnant, have a "severe disabling joint disease," or who have a new post-op joint replacement.  The second type, a "medical mattress," is a thicker specialized mattress made of alternate material.  Appendix 1 provides that the medical mattress may be provided for inmates with a debilitating condition such as bed sores, 3rd degree burns, or paraplegia/quadriplegia with skin issues.  The Bureau of Health Services Medical Director must authorize prison officials to order the mattress.

18

An inmate may submit a request for a special needs restriction or accommodations through an HSR, which would be triaged using the process outlined above and then referred to Waupun's Committee.  At Waupun, the Committee usually includes at least one staff member from the HSU, the ADA coordinator, and a security supervisor or staff member.  The Committee meets once per month to consider inmate requests.[3]  It issues decisions based on its review of an inmate's request and a review of the inmate's relevant medical records.  The Committee may also request that an inmate undergo a special needs assessment in the HSU if the Committee needs more information.

In November 2018, the Committee consisted of Anthony Ashworth, Bailey Frame, Angelia Kroll, Nurse Donna Larson, and Food Supervisor Wilson.[4]  On November 29, 2018, they reviewed Grice's request for an extra mattress or a medical mattress.  The Committee denied Grice's request for a medical mattress because Grice's medical condition did not meet the criteria set forth in Appendix 1 of Policy 300.07: Grice had not been diagnosed with a bed sore, 3rd degree burns, or paraplegic/quadriplegia with skin issues.  The Committee denied Grice's request for an extra mattress – or a thick mattress – because his degenerative joint disease had not been diagnosed as "severe" or "disabling" at that time.

On January 6, 2018, Grice renewed his request for a medical mattress in an HSR to the Committee, repeating his concerns about his hip.  The HSR was received on January 8, 2019, and Nurse Donna Larson responded that same day: "You don't meet criteria per policy and

---

[3] Grice claims that the Committee denied his request for a mattress twice in one month.  This dispute is not material to Grice's claims against the Committee members.

[4] Grice disputes who was on the committee; he claims that Meli informed him that Dr. Deblanc was also a member of the committee.  Defendants respond that even assuming someone (including Meli) told Grice that Deblanc was on the committee, that person was mistaken, and that Meli and Deblanc attest that Deblanc was not a member of the Committee.

procedure 300.07." (*Id.* at 194.)  At the time Larson responded to Grice's HSR, the results from Grice's January 8, 2019, appointment had not yet been received from Agnesian.  According to Meli, signatures on the Agnesian records indicate that the advanced care provider at Waupun reviewed the January 8, 2019, x-ray report on January 11, then reviewed the office clinic notes on January 23.  (Ex. 1000 (dkt. 94-3) 123-26, 194.)

On January 13, 2019, Grice submitted an HSR in which he renewed his request for a medical mattress and added a request for a single cell.  Those requests were referred to the appropriate committee the next day.  (Pl. Ex. 36 (dkt. 85-36).) On January 17, 2019, the Committee, at that time consisting of Meli, Kuepper, Frame, Tritt, and Larson, reviewed Grice's request for a medical mattress and single cell. (Ex. 1000 (dkt. 94-3) 161.)  The Committee again denied his request for a medical mattress, indicating that there was no "medical indication" for his request, and that the request did not meet the criteria in Policy and Procedure 300.07.  The Committee also rejected Grice's request for a thick mattress or a second regular mattress.  Meli cannot remember why the Committee did not approve a thick mattress at that meeting, but she surmises that the Committee had not yet reviewed the results of Grice's January 8, 2019, x-ray, and instead were still relying on his December 26, 2018 MRI.  (Meli Decl., dkt. 94, ¶ 38.)  The Committee referred Grice's request for a single cell to the Single Cell Committee.

On March 7, 2019, the Committee, then including Meli, Tritt, Correctional Officer Wodack, Social Worker Starkes, and Nurse Larson, reviewed Grice's request for a medical mattress.  At that point, the Committee concluded that although Grice's condition did not warrant a medical mattress, because his condition changed from moderate to severe degenerative

joint disease, a thick mattress was warranted. Because Waupun did not have a thick mattress at that time, Grice was given a second mattress.

### 4. Grice's Inmate Complaint Regarding the Mattress Denial

In addition to faulting Meli for her handling of these information requests, Grice charges Meli with improperly involving herself in the investigation into Grice's inmate complaint related to his mattress requests. On December 10, 2018, the Institution Complaint Examiner's Office received WCI-2018-25278, in which Grice complained about the Committee's November 29, 2018, denial of his request for an extra mattress or medical mattress. To investigate this complaint, Institution Complaint Examiner (ICE) James Muenchow requested a summary of Grice's medical care from Meli and he reviewed excerpts of Grice's medical file. Muenchow recommended that the Reviewing Authority dismiss the complaint because Muenchow did not have the expertise to determine whether Grice's medical condition warranted a certain type of treatment. However, he further wrote that he would defer to the Bureau of Health Services' Nursing Coordinator's review. Although Meli provided a summary of the facts to Muenchow, she did not recommend that Muenchow take any particular action.

Grice did not serve a notice of claim upon the Attorney General pursuant to Wis Stat. § 893.82, regarding his claims in this lawsuit.

### OPINION

## I.    Summary Judgment Standard

The parties have filed cross motions for summary judgment. Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When the parties cross-move for summary judgment, the court looks to the burden of proof that each party would bear on an issue at trial and requires that party to go beyond the pleadings to affirmatively establish a genuine issue of material fact. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either moving party fails to establish the existence of an element essential to his or her case on which that party will bear the burden at trial, then summary judgment against that party is appropriate. *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

## II.   Medical Care Deliberate Indifference

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must prove two elements: (1) he had an objectively serious medical condition and (2) a state official was deliberately (that is, subjectively) indifferent to his condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir.

2011).  In their summary judgment motion, defendants do not dispute that Grice's hip condition amounted to a serious medical need, but they contend that no reasonable trier of fact could find that they responded to Grice's condition with deliberate indifference.

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Deliberate indifference constitutes more than negligent acts, or even grossly negligent acts, although it requires something less than purposeful acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

A jury may infer deliberate indifference on the basis of a physician's treatment decision when that decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.  *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).  A jury also may infer deliberate indifference when a medical provider persists in a course of treatment known

to be ineffective; or when the treatment involved an inexplicable delay lacking a penological interest. *Petties v. Carter*, 836 F.3d 722, 729-31 (7th Cir. 2016). The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728; *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

### A.   Tapio

Tapio's handling of Grice's medical needs between June and September 2018 does not support an inference of deliberate indifference. In June 2018, Tapio ordered several interventions: he started Grice on a new medication (naproxen) to supplement Tylenol and ibuprofen, he provided a topical cream, and he ordered physical therapy, an MRI, a consultation with an orthopedist, and various screening tests. In their subsequent interactions, Tapio responded to Grice's reports of continued pain by starting him on a trial of amitriptyline and ordering a lower tier restriction, eventually substituting nortriptyline for the amitriptyline and adding celecoxib when Grice's pain went unabated. Although Grice asserts that Tapio ignored his pain, he fails to point to any instance suggesting that Tapio ignored his condition or failed to exercise medical judgment.

Grice points to Tapio's alleged failure to order him a pillow after the June 20 appointment. Setting aside the fact that Tapio disputes Grice's claim that he agreed to order the pillow, Grice is not explicit with respect to what Tapio allegedly promised him. Grice claims that Tapio advised him to put a pillow between his legs but does not explicitly claim that Tapio assured him he would order it. Regardless, even assuming that Tapio said that he would order it and neglected to do so at that time, given all of Tapio's other orders that same day, this

omission at the very most *might* support a finding of negligence, but even that would be a stretch. It certainly does not rise to the level of deliberate indifference. *See Robbins v. Waupun Corr. Inst.*, No. 16-cv-1128, 2016 WL 5921822, at *3 (E.D. Wis. Oct. 11, 2016) (collecting cases finding that "an isolated mistake does not allow a plausible inference of deliberate indifference."); *Blake v. Warner*, No. 17-cv-220-bbc, 2018 WL 3075832, at *4 (W.D. Wis. June 21, 2018) ("[A]lthough Johnson made a mistake in failing to review plaintiff's records more carefully, nothing in the record suggests that her mistake was the result of deliberate indifference."), *aff'd*, 756 F. App'x 653 (7th Cir. 2019); *see also Burton*, 805 F.3d at 785 ("[W]ithout evidence that defendants acted with requisite bad intend in delaying the dispensation of his medication, Burton's allegations are insufficient to sustain a deliberate indifference claim.").

Grice would further fault Tapio because Tapio's June 20 order for naproxen and September 24 order for celecoxib were delayed. It is undisputed and unfortunate that Grice had to wait approximately two weeks to start on naproxen, and slightly more than a month to start celecoxib. Yet Tapio was entitled to rely on HSU staff to carry out that order. *Norwood v. Ghosh*, 723 F. App'x 357, 366 (7th Cir. 2018) (physician assistant not deliberately indifferent in relying on a medical technician to review notes and ensure plaintiff received the orders and was scheduled for follow-up, so long as physician assistant did not have reason to believe her orders were not being processed (citing *Minix v. Cancarecci*, 597 F.3d 824, 834 (7th Cir. 2010); *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Knight v. Wiseman*, 590 F.3d 458, 462-63 (7th Cir. 2009)). No evidence of record suggests that Tapio failed to order the medications the day of those appointments. Further, no evidence of record suggests that while

25

Grice was waiting for these medications, Tapio learned that Grice was not receiving them and failed to take corrective action.

Relatedly, Grice claims that Tapio cancelled a prescription of Lyrica in September 2018, which Tapio disputes. To start, given that nurses do not have the authority to prescribe a medication like Lyrica, it strains credulity that such a prescription existed in the first place, much less that Tapio cancelled it. In any event, in Tapio's professional opinion, Grice's symptoms did not justify him taking Lyrica. Because Grice points to no evidence calling into question Tapio's judgment on this point, it would be unreasonable to infer that Tapio was deliberately indifferent either by failing to prescribe Lyrica at that time or by cancelling a nurse's order for it.

Finally, to the extent Grice claims that Tapio's approach to his condition was ineffective, the record does not support a such a finding. To establish that a doctor persisted in an constitutionally ineffective course of treatment, a plaintiff must provide evidence that the physician "'doggedly persist[ed] in a course of treatment known to be ineffective.'" *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quoting *Greeno*, 414 F.3d at 655). That's not what happened here. Each time Tapio met with Grice and they discussed his pain management, Tapio suggested a different pain medication in an effort to find one that worked. To the same effect, when Grice reported that he was not taking amitriptyline due to a perceived urinary problem, Tapio switched him to nortriptyline and added celecoxib. From the start, Tapio had ordered additional interventions to address Grice's condition (an MRI, orthopedic consult, and physical therapy), which culminated in Grice receiving hip replacement surgery. On this record, Tapio's responsiveness to Grice's complaints does not support an inference of deliberate indifference.

Accordingly, Tapio is entitled to judgment in his favor on Grice's deliberate indifference claim, and Grice's request for judgment against Tapio will be denied.

### B. Meli

Grice claims that Meli failed to respond properly to his complaints about his medical care on September 27, 2018, and November 21, 2018. The evidence of record includes several other instances in which Grice brought concerns about his medical care to Meli's attention, some of which I addressed at screening and concluded did not support an inference of deliberate indifference. (9/30/2019 Order, dkt. 39, at 7-8; 12/17/2019 Order, dkt. 64, at 2-6.) Although technically not part of the claims upon which Grice is proceeding, out of completeness, I will address why *none* of Meli's responses to Grice information requests support an inference of deliberate indifference. (Meli's involvement in the Committee's denial of his request for a medical mattress on January 13, 2019, is a different matter which I address separately below).

The record shows that between July 2018 and February 2019, Meli responded to Grice's complaints about his medical care on six occasions. None of these responses suggest that Meli consciously disregarded Grice's need for medical treatment. On July 24, 2018, October 30, 2018, and December 18, 2018, Meli responded to Grice's general complaints about past treatment and a delay in receiving his medication. As for July and December communications, Grice had just recently seen an advanced care provider and had received an adjustment to his pain medications, and as of October 30, Grice had started receiving the medication that had been delayed. There is no indication from the record that Meli had reason to infer that more needed to be done to address Grice's concerns. Additionally, although Grice raised a concern

in December that he remained in pain, Grice had only met with Dr. Jeanpierre a few days before, on December 13, when she had prescribed gabapentin to see if that would better alleviate Grice's pain.  In short, Meli acknowledged Grice's concerns and followed up by ensuring that he was scheduled to be seen and that his medication orders were being properly processed.  The Eighth Amendment did not require her to do more.

Similarly unproblematic is Meli's September 27, 2018, response to Grice's complaints that he had not started physical therapy or seen a specialist, and that his pain medications were not working.  As to the issue with physical therapy, Grice had to wait four months (from June 20 to October 24) to start physical therapy, and he complained to Grice about it on September 20, three months after Tapio had prescribed it.  Meli explains that it was not a red flag to her that Grice had waited this long because the waiting list for physical therapy typically was three to six months. Grice has not provided any evidence suggesting his delay was unique, such as examples of other inmates with shorter wait times for less serious conditions.  The Seventh Circuit has recognized that delays are common in the prison setting with limited resources; therefore, "whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment."  *Petties*, 836 F.3d at 730.  No evidence of record suggests that Meli was aware Grice's condition was more serious than other prisoners waiting to start physical therapy, if in fact it actually was.  As a result, even if I assume for the sake of argument that Meli *could* control Grice's place on the physical therapy wait list–which has not been established–her failure to attempt to let Grice cut ahead of others waiting  in line does not support a finding of deliberate indifference.

28

With respect to Grice's concern about his medications, Meli observed that he had been seen by an advanced care provider on September 24 (after Grice submitted his information request on September 20), and Tapio had started him on new medications.  Although Grice had not started  his trial use of celecoxib as of September 27, the record does not suggest that Meli knew this.  As such, her failure to take any additional action with respect to Grice's complaint that his medications were not working does not support an inference of deliberate indifference.

On November 21, Grice complained to Meli that his pain medications were not working, and Meli responded that Grice had only started his new medication on November 13, about a week prior.  At that point, it was reasonable for Meli to defer to Dr. Jeanpierre's November 9, 2018, prescription decision because Meli had no information suggesting that Dr. Jeanpierre's medical judgment was incorrect. Meli points out that as of November 21, Grice had access to naproxen, acetaminophen, topical pain relief creams, duloxetine, celecoxib, and nortriptyline; he had been seen by the physical therapist; and he had been provided with a cane, a low bunk, ice, and an extra pillow.  In Meli's view, there were no further interventions that she, as a nurse, could have provided to Grice.  All she could do was to refer Grice to an advanced care provider, and that already had been done.  But there's more: Grice had been scheduled for an MRI and an orthopedic consultation.

Meli explains that she had no reason to believe that Grice's complaints were not being addressed because he was being seen frequently by nursing staff and advanced care providers, he had been prescribed multiple pain relieving aids, he had received imaging studies, and he had been referred to physical therapy and to an offsite orthopedic specialist for his hip pain.  At that point, within two weeks of Grice's last appointment with Dr. Jeanpierre, Meli was entitled to

defer to the treatment and the scheduling decisions of the advanced care providers managing Grice's condition. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on a doctor's instruction unless it's obvious that the doctor's advice will harm the prisoner). Then, on December 4, 2018, when Grice *continued* to complain that he remained in pain, Meli responded that she would move up his appointment with Dr. Jeanpierre. No evidence of record suggests that Meli had reason to believe she should have moved up Grice's appointment sooner than she did.

Finally, the record does not suggest that Meli inappropriately involved herself in Grice's inmate complaint challenging the Committee's November 29, 2018, denial of a medical mattress for Grice. In response to Muenchow's request for a summary of Grice's medical care, Meli simply provided the requested information. Grice has not pointed to any evidence suggesting that Meli directed Muenchow to make a certain recommendation with respect to Grice's allegations in the inmate complaint. In any event, Muenchow noted that he could not make a judgment call with respect to the quality of Grice's medical care. Thus, even assuming that Meli's summary of Grice's medical records affected Muenchow's handling of the inmate complaint, it did not determine–could not have determined– the outcome. Accordingly, Meli is entitled to judgment in her favor with respect to her responses to Grice's information requests and her involvement in resolving Grice's inmate complaint. I am granting defendants' motion as to Grice's Eighth Amendment claim against her, and denying Grice's corresponding request for judgment against Meli.

30

### C.  Committee Members Meli, Deblanc, Kuepper, Tritt, Larson, and Meli

As an initial matter, Dr. Deblanc is entitled to judgment and dismissal because no reasonable jury could conclude she ever was a member of the Committee during the relevant time period.  To be held liable under § 1983, a plaintiff must prove the defendant's personal participation or direct responsibility for the constitutional deprivation.  *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016).  More specifically, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).

Grice insists that because he was told by Meli or another Waupun official that Dr. Deblanc was a member of the Committee between December 2018 and March 2019, that's enough to show that Dr. Deblanc was involved in denying Grice's requests for a medical mattress.  Not so.  This statement by someone other than Dr. Deblanc–it's not even clear who– is being offered by Grice to prove the truth of the matter asserted in it.  That makes it inadmissible hearsay.  *See* Fed. R. Evid. 801(c) and 802; *see also MMG Financial Corp. V. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011)("A party may not rely on inadmissible hearsay to avoid summary judgment.").  Although this is dispositive, even if this statement were not hearsay, it wouldn't prevent summary judgment: there is no genuine dispute that Dr. Deblanc was not on the Committee at the relevant time.  Defendants report that Deblanc was not on the committee and Grice has not countered this with any evidence that she actually was.  A palpably incorrect statement by someone to the contrary does not create a genuine issue of material fact.

As for the actual Committee members, they are entitled to judgment with respect to their November 29, 2018, and January 8, 2019, mattress denials, but not their January 17, 2019, denial.

The record before this court does not provide insight as to what exactly the individual Committee members considered when denying Grice's three requests. Meli explains that the Committee issues decisions based upon the inmate's request "and a review of the related medical records by the HSU staff members on the Committee." (Meli Decl., dkt. 94, ¶ 29.) Therefore, I will evaluate whether the denials support an inference of deliberate indifference based on running Grice's contemporaneous medical records past the guidelines of Appendix 1 to Policy and Procedure 300.07.

Using this procedure, I conclude that the November 29, 2018, and January 8, 2019, denials do not suggest deliberate indifference. To start, at the time of both denials, Grice did not qualify for a thick mattress by the terms of Appendix 1, because the diagnosed severity of his degenerative joint disease up until January 8, 2019, was "moderate." Although Grice disagrees with the that diagnosis, the record is devoid of evidence suggesting that any of the Committee members knew Grice's diagnosis was worse and refused to consider granting a request for a thick mattress. Moreover, there is no indication that a medical professional had recommended that Grice receive a thick, or extra mattress, or a medical mattress, prior to either request date. Rather, the first ACP to advocate for a new mattress was Dr. Jeanpierre, and she did not recommend a medical mattress for Grice until March 6, 2019. Although it appears that Grice may have had discussions with other HSU members about obtaining a better mattress, there is no indication that any Committee member was aware that an ACP was recommending

a better mattress. Therefore, at least as to these two denials, no reasonable fact-finder could conclude that the Committee consciously disregarded an obvious need for a thick or extra mattress, or a medical mattress.

The January 17, 2019, denial requires a different result: by then, Dr. Nelson had diagnosed Grice's condition as "severe," meaning that Grice qualified for a thick mattress under the guidelines. But defendants have come forward with virtually no evidence detailing the Committee's reason for concluding that Grice's condition did not qualify him for a medical mattress or thick mattress. The denial itself is a one-page document on which the Committee could check an option for granting the request or denying it, and add notes. On the January 17, 2019, denial, the Committee placed an "x" next to the option entitled "Your request for the following has been denied. There is no medical indication and your request does not meet Policy and Procedure 300.07 criteria." (Ex. 1000 (dkt. 94-3) 161.) Absent from that document is any explanation why Grice's condition did not qualify him for a thick mattress, or what records the Committee members reviewed in making its determination.

Further, defendants Kuepper, Tritt, Frame, and Larson did not submit declarations explaining their reasoning. Only Meli did and her memory does not shed light on the Committee's thought process. Instead, she believes the Committee simply did not review the results of Grice's January 8, 2019, when they considered his January 17, 2019, request. Although defendants represent that Waupun staff did not *review* the records from his January 8, 2019, visit until January 23, 2019, there is no indication that the records themselves from Agnesian had not been *included* in Grice's file so that they would have been available to review. Based on this thin evidence, no one is entitled to summary judgment on this claim.

Typically I would review each Committee member's recollection of the January 17, 2019, Committee meeting to evaluate their individual liability. This would have been especially helpful here, where each Committee member represents different institutional interests, and the gap here may very well be a failure to review Grice's most recent medical records. However, because the record only includes Meli's hazy recollection of the meeting, I cannot parse out each Committee member's liability separately. Instead, based on the record before the court, two inferences are available: (1) The Committee members failed even to consider Grice's January 8, 2019, diagnosis from Dr. Nelson; or, (2) All of them knew about the new diagnosis but refused to provide a thick mattress to Grice even though he qualified under Appendix 1 of Policy and Procedure 300.07.

If inference (1) is accurate, then it is possible that the Committee's failure to consider Grice's most recent medical records on January 17, 2019, was the result of Meli's or Larson's negligence or gross negligence (by failing to make the diagnosis available), so that Kuepper, Tritt, and Frame are blameless. As HSU staff, Meli and Larson may have been responsible for reviewing and gathering Grice's medical records for purposes of the January 17, 2019, Committee meeting. Their failure to do so might amount to negligence or gross negligence, but then it would follow that Kuepper, Tritt, and Frame could have reasonably relied on Meli and Larson to provide Grice's most up-to-date medical records for the January 17, 2019 meeting.

As for inference (2), the evidence is unclear whether the Committee members *did* know that Grice's diagnosis had progressed from moderate to severe and they simply ignored Dr. Nelson's professional opinion. If this is what happened, then a reasonable fact finder could find that the Committee members consciously disregarded Grice's clear need for a thick mattress, given his diagnosis and the guidance of Appendix 1 of Policy 300.07.

This lack of evidentiary clarity prevents the court from concluding that any of the Committee members–or Grice–is entitled to judgment as a matter of law.

This lack of evidentiary clarity also means that the Committee members are not entitled to qualified immunity, which "protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).  It was clearly established in January of 2019 that prisoners have the right to be free from deliberate indifference to their serious medical needs, and a reasonable jury might find that the Committee's January 17, 2019, decision exhibited deliberate indifference.  Accordingly, I find that defendants Meli, Kuepper, Tritt, Frame, and Larson are not entitled to summary judgment with respect to the January 17, 2019, denial of his request for a medical mattress.  However, I am also denying Grice's motion for summary judgment, since the record remains unclear what the individual defendants on the Committee reviewed, and why they denied his request on January 17, 2019.

### D.  Dr. Jeanpierre

Given that Dr. Jeanpierre consistently exercised medical judgment in handling Grice's pain and treatments, she is entitled to judgment on the merits.  As an initial mater, I granted Grice leave to proceed against Dr. Jeanpierre because Grice alleged that she was involved in denying him a medical or thick mattress, but the evidence establishes that Dr. Jeanpierre was not involved in any of the Committee's review of Grice's mattress requests.  Her only involvement

in Grice's request for a medical mattress was on March 6, 2019, when she recommended a medical mattress.  There is no basis hold her accountable for Grice's failed efforts at obtaining a thick or extra mattress sooner.

Similarly, Grice does not challenge Dr. Jeanpierre's treatment decisions between November 2018 and early January 2019, nor would he have prevailed if he had.  During that time frame, Dr. Jeanpierre prescribed Grice a new chronic pain medication (duloxetine), refilled his prescription, and met with him multiple times.  In particular, in December, when Grice reported that his pain continued to be a 10 out of 10, Dr. Jeanpierre started him on gabapentin and a Medrol-Dosepak to supplement the duloxetine.  She issued an order to allow him to eat in his cell because he was having trouble walking. On January 2, 2019, when Grice reported that the gabapentin dosage was not helpful, she doubled his daily dosages and referred him to a pain clinic for possible injections.  Grice has not pointed to any instance in which Dr. Jeanpierre failed to exercise medical judgment.

Instead, Grice primarily points to his cancelled appointments with Dr. Jeanpierre that occurred in 2019.  These cancellations do not suggest deliberate indifference.  Dr. Jeanpierre explains that Grice's January 29, 2019, appointment was cancelled because she did not see a need to examine him prior to his February 21 injections; Dr. Jeanpierre was not present at Waupun for a period of time in late January and early February, so she would not have been able to see Grice; and Dr. Jeanpierre had to change her schedule on February 19, 2019.  Furthermore, in June, although Dr. Jeanpierre had to cancel Grice's June 2 and 5 appointments, she examined him soon thereafter, on June 10, 2019.

36

Given the context of the cancellations, Dr. Jeanpierre's failure to meet with Grice on these occasions does not demonstrate deliberate indifference.  Although Dr. Jeanpierre did not meet with Grice on January 29 and her February 19 appointment with him was cancelled due to a change in her schedule, in her judgment, that appointment was not necessary:  By early January, Dr. Jeanpierre had prescribed gabapentin for Grice and increased his dosage, and then on January 21, 2019, Dr. Jeanpierre ordered that Grice undergo the injections recommended by Dr. Nelson.  In Dr. Jeanpierre's opinion, she did not see a reason to meet with Grice on January 29, given his upcoming appointment and the medications and other interventions available to him. Without any indication that Dr. Jeanpierre was not exercising medical judgment in declining to examine Grice during this time frame, no reasonable fact finder could find deliberate indifference. *See Zaya v. Sood*, 836 F.3d 800 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

Likewise, the cancelled appointments  for June 2 and 5, 2019, do not suggest deliberate indifference by Dr. Jeanpierre.  In viewing the totality of Dr. Jeanpierre's care, the fact that she moved this appointment back a week does not suggest deliberate indifference.  Again, context matters: back in April, when Dr. Jeanpierre and Grice discussed the possibility of surgery, she continued him on his medications (acetaminophen, capsaicin, celecoxib, gabapentin, and muscle rub), ordered him a longer cane, and continued the orders for lidocaine cream, ice therapy, and a low bunk.  Then in May Dr. Jeanpierre had submitted a request that Grice undergo total left hip replacement surgery, and followed up with Dr. Bekx when he pushed back asking that she

37

confirm that he had no other options beyond surgery.  These actions suggest that Dr. Jeanpierre was making continual efforts to address Grice's condition.

That's not to say that Dr. Jeanpierre could refuse to see Grice if he genuinely needed quicker medical attention from an ACP.  But Grice has not cited any evidence suggesting that the June 2 appointment was scheduled to address an urgent need.  More to the point, Grice has not submitted any evidence that when the appointments were rescheduled, Dr. Jeanpierre *knew* that Grice needed to be examined before June 10, 2019 and consciously disregarded an actual need to see him earlier. In his complaints about the cancelled appointments, Grice did not assert an urgent need to see an ACP; instead, he wrote that he wanted to discuss medication, surgery, and stomach pain.  (*See* Schneider Decl., Ex. A, dkt. 89-1, at 285, 288.)  Also worth noting: in a June 6, 2019, HSR, Grice requested a single cell; he did not raise any concerns about Dr. Jeanpierre rescheduling his appointment or expressing an urgent need to be seen by a doctor. (*Id.* at 286.)

A scheduling delay like this, when Grice was not raising any urgent need to be seen, at most might suggest that Dr. Jeanpierre was not highly proactive about addressing Grice's chronic pain at that particular point.  But a delay of this nature does not support an inference of deliberate indifference.  *See Forstner v. Daley*, 62 F. App'x 704, 706 (7th Cir. 2003) (26-month delay for treating a knee joint injury, caused by a transfer of inmate and scheduling problems, was not deliberate indifference); *Zimmerman v. Prison Health Servs., Inc.*, 36 F. App'x 202, 203 (7th Cir. 2002) (delayed biopsy resulting from "bureaucratic obstacles and perhaps negligence" and "scheduling difficulties" was not unconstitutional).

Dr. Jeanpierre has not explained why those appointments were rescheduled, nor has she reported whether she was responsible for rescheduling them. This gap in the record is not particularly concerning, however, because for Grice to prove that this short delay constituted deliberate indifference, Grice would need to show that the delay "exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31. I accept Grice's report that he was in pain in the first week of June, but under the totality of circumstances, this isn't enough. Grice's pain arose from severe degenerative joint disease, which made it chronic and very difficult to manage, as demonstrated by his treating providers' ongoing and varying interventions to address his pain over the prior year. As a result, there is no basis to infer that this week-long delay associated with a rescheduling constitutes deliberate indifference by Dr. Jeanpierre.

Dr. Jeanpierre's June 10 appointment with Grice is not problematic. They talked about trying a new pain medication– pregabalin– because it appeared to Dr. Jeanpierre that gabapentin was not working for Grice. There is no indication from the record that Dr. Jeanpierre knew that the pharmacy would not approve the pregabalin. When Dr. Jeanpierre learned that the pregabalin order did not go through, she started Grice on a higher dose of naproxen than he previously had taken. Grice may be frustrated that he did not receive that medication, and perhaps Dr. Jeanpierre could have pushed harder to have the pharmacy approve the pregabalin, but the Eighth Amendment does not entitle Grice to the best care possible, *Forbes*, 112 F.3d at 267, and no evidence indicates that Grice had a such a clear need for pregabalin that Dr. Jeanpierre was obliged to obtain it for him.

Finally, Grice appears to fault Dr. Jeanpierre for the delay in his receipt of APNP Moore's salsalate prescription. It is undisputed that after June 28, 2019, Dr. Jeanpierre no longer was

involved in Grice's medical care, and Grice has not pointed to any evidence suggesting that she was aware that he did not receive a prescription in a timely fashion then failed to take corrective action.  Grice obviously takes issue with the fact that he did not meet with Dr. Jeanpierre as often as he wished and  that she cancelled and rescheduled some of his appointments.  However, the record of her treatment decisions does not reveal any instance in which she *ignored* Grice's need for medical attention or made a decision so blatantly inappropriate that a reasonable fact finder might conclude she failed to exercise medical judgment.  Accordingly, Dr. Jeanpierre is entitled to judgment as a matter of law with respect to Grice's deliberate indifference claim, and Grice is not entitled to judgment in his favor.

## III.    State Law Claims

All defendants seek judgment on Grice's state law claims. I will address the state defendants' notice-of-claim argument because it is dispositive.  *See Korzen v. Local Union 705*, 75 F.3d 285, 288-89 (7th Cir. 1996) ("The normal practice is to relinquish jurisdiction over a supplemental claim when the claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.")

The state defendants contend that Grice failed to follow Wisconsin's notice of claim statute, Wis. Stat. § 893.82.  As state employees, Wisconsin's medical malpractice statute does not apply to them.   These claims are governed by Wisconsin's notice of claim requirements.  *See Smith v. Hentz*, No. 15-cv-633-jdp, 2018 WL 1400954, at *1-3 (W.D. Wis. Mar. 19, 2018) (citing *Lamoreux v. Oreck,* 2004 WI App 160, ¶ 50, 275 Wis. 2d 801,

828, 686 N.W.2d 722, 735 (dismissing medical malpractice action against state employee because plaintiff failed to satisfy the applicable notice of claim requirements)).  It is undisputed that Grice did not submit a notice of claim as to his state law negligence claims against any of defendants.  Therefore, those claims will be dismissed for failure to comply with the notice of claim requirements set forth in § 893.82.

Dr. Jeanpierre seeks judgment on Grice's state law claim against her on the grounds that he has not proven causation and because Grice failed to name a medical expert to establish the standard of care.  It is not clear that this claim lacks merit for those reasons, but I need not resolve these questions.  Because Grice's corresponding federal claim has been resolved before trial, I will relinquish jurisdiction over this claim.  28 U.S.C. § 1367(c); *Burritt v. Diflefsen*, 807 F.3d 239, 252 (7th Cir. 2015).  Subject to the applicable Wisconsin statute of limitations, Grice may pursue his negligence claim against Dr. Jeanpierre in state court.

## IV.    Motion for Assistance in Recruiting Counsel.

Finally, I am denying Grice's motion for assistance in recruiting counsel.  A pro se litigant does not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist pro se litigants in finding a lawyer to represent them.  *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007).  A party who wants assistance from the court in recruiting counsel must meet certain requirements.  *Santiago v. Walls*, 599 F.3d 749, 760–61 (7th Cir. 2010).

To start, Grice must show that (1) he is unable to afford counsel and (2) he made reasonable efforts on his own to find a lawyer to represent him.  Grice is proceeding in this

41

lawsuit *in forma pauperis*, so I accept that he is indigent.  However, Grice has not shown that he has made reasonable efforts to find a lawyer to represent him.  Typically this court requires pro se litigants seeking the court's assistance in recruiting counsel to submit letters from at least three attorneys declining to represent him.  Grice has not submitted any such evidence, nor does he attest that he reached out to any attorneys seeking representation.  Therefore, I am denying his motion for this reason.

Even assuming, *arguendo*, that Grice had shown reasonable efforts to recruit an attorney, I would deny his motion.   Grice asks that the court recruit an attorney to assist him at trial, since trial presents the difficult tasks of questioning witnesses and dealing with conflicting testimony. These *are* relatively difficult tasks, but I am not persuaded that this is one of the relatively few cases in which these difficulties exceed the pro se plaintiff's demonstrated ability to prosecute it.  *Pruitt*, 503 F.3d at 654–55.

Grice's summary judgment submissions demonstrate his clear command of the facts,  legal standards, and authorities that govern  his claims.  His only claim remaining for trial in this court is fact-based: why did specific committee members decline to approve Grice's request for a thick mattress on January 17, 2019?  Expert testimony is not necessary for Grice to prove this claim.  Grice will need to elicit from each committee member who denied his request why they voted "no" and whether in so voting they had review Grice's most recent medical records.  Grice does not need the assistance of an attorney to help him elicit such testimony or to argue that the Committee members consciously disregarded his need for a thick mattress.

Finally,  although jury trials are challenging for pro se prisoner plaintiffs, they are routine in this court(because  we don't have nearly enough volunteer attorneys), so we have a lot of

helpful procedures in place. Once the trial schedule is reset, I will issue a Trial Preparation Order that details the chronology of the trial and provides further guidance to Grice as he prepares for trial.  Between that order and the other materials that Grice has received from this court, Grice will be able adequately to try this case to a jury.  Accordingly, I am denying Grice's motion.


ORDER

IT IS ORDERED THAT:

1)  The state defendants' motion for summary judgment (dkt. 91) is DENIED as to defendants Meli, Kuepper, Tritt, Larson,  and Frame's January 17, 2019, denial of plaintiff's request for a medical mattress.  The motion is GRANTED in all other respects.

2)  Defendant Dr. Jeanpierre's motion for summary judgment (dkt. 86) is GRANTED with respect to plaintiff's Eighth Amendment claim.  The court declines to exercise supplemental jurisdiction over plaintiff's state law claim against Dr. Jeanpierre.

3)  Plaintiff Regis Grice's motions for summary judgment (dkt. 54, 80) are DENIED.

4)  This matter is set for a telephonic scheduling conference on January 12, 2021 at 11:00 a.m.  Counsel for defendants are responsible for initiating the call to the court at (608) 264-5153.


Entered this 30th day of December, 2020.

BY THE COURT:

/s/


STEPHEN L. CROCKER
Magistrate Judge